UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIO CERAME | : | |
| Plaintiff, pro se | : | |
| v. | : | |
| Edward "Ned" Lamont, Jr., | : | 3:21-cv-01508 (JCH) |
| Governor of the State of Connecticut; and | : | |
| Richard J. Colangelo, Jr., | | |
| Chief State's Attorney of Connecticut | : | |
| Defendants | : | |
| In their official capacities only | | MAY 2, 2022 |

## <u>MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS</u>

On February 9, 2022, the Defendants filed a 12(b)(1) motion to dismiss alleging lack of subject matter jurisdiction.  Specifically, the Defendants claim the action is barred by Eleventh Amendment immunity and because I lack standing.  I object in part. I concede and withdraws claims as to Defendant Lamont.  The Motion should be denied, however, as to Defendant Chief State's Attorney Colangelo (CSA).

I include attached as Exhibit A an affidavit describing with more particularity the factual bases for the claim in the present case.

If the Court should find arguments by the CSA nonetheless persuasive, I respectfully request leave to amend to address possible defects.  It is believed that any deficiency could be cured by adding the State's Attorney for Hartford Judicial District, which is the Judicial District where I reside. In the second alternative, I ask for any dismissal to be without prejudice to refile as to a that defendant or with more particularized factual allegations.

1

## I.  RELEVANT FACTS

I do not take issue with the Defendants' citations in part I of their Memorandum in Support (Memorandum).  Further facts and procedural history are, however, set forth as necessary.

## II.  LEGAL STANDARD

I do not quibble with the Defendants' recitation of the well-established legal standard governing the Motion.

## III. ELEVENTH AMENDMENT DOES NOT COMPLETELY BAR SUIT

I agree with the defendants that the Eleventh Amendment question turns on *Ex parte Young* and its progeny.

### A.  11A <u>Does</u> Bar Suit Against Defendant Lamont

After reviewing the relevant authorities cited by the Defendants on pages 8–9 of their Memorandum, I agree entirely with the Defendants on this point.  To this end, I seek leave to amend the complaint, removing Lamont as a Defendant.

### B.  *Russo* Should Control as to the CSA, not the State's Cited Authorities

1. <u>*Russo* is on Point, and Under *Russo*, the Motion Should Be Denied</u>

There isn't a lot of helpful case law on point.  For obvious reasons, there aren't a lot of suits that don't seek money damages, and money damages are almost always blocked by the Eleventh Amendment in official capacity suits.  Suits seeking only prospective injunctive relief against the CSA are unusual.  But the issue before the Court now came before Her Honor about 20 years ago, and the Court should follow the same reasoning here.

*Russo v. City of Hartford*, 184 F. Supp. 2d 169 (D. Conn. 2002), was a complicated, messy case against numerous State and City officials.  The case consisted of three consolidated cases, *Russo v. Hartford, et al.*, 3:97-cv-2380; *Russo v. Bailey, et al.*, 3:00-cv-1794; and *Russo v. Marquis, et al.*, 3:00-cv-2382.  In *Russo v. Bailey, et al.*, 3:00-cv-1794, the then-CSA John M. Bailey is a named defendant; he is also a consolidated defendant in *Russo v. Hartford, et al.*, 3:97-cv-2380.  The full paperwork for the case is not available on PACER, but the judgment on the relevant motion to dismiss concerning the then-CSA is published.

Among other things, Russo filed suit against "State Defendants," which the opinion identifies on page 179 as including the CSA.  The Office of the CSA was a movant for the motion.  *Russo v. City of Hartford*, *supra*, 184 F. Supp. 2d at 174.  The Court notes at 181 that:

> "Russo articulates a claim for prospective injunctive relief . . . and money damages. . . . With regard to Russo's claim for prospective injunctive relief, the State Defendants' motion to dismiss the complaint as to the State Defendants in their official capacity based on the Eleventh Amendment is denied."

I do not have at my disposal the briefs filed to know what arguments were raised.  But this is the clearest case on point—the **only** case directly on point that I was able to find as to the Connecticut CSA in the context of this specific 11A issue.  Consider alsothat the only Second Circuit authority the State relies on in this section is *Powers v. Coe*, 728 F.2d 97, 99 n.3 (2d Cir. 1984), which was ostensibly available to the sophisticated counsel as well as the Court at the time judgment was rendered on the 12(b)(1) motion in *Russo*.

3

There is no reason presented why the judgment here should be different—no change in the material facts or law since *Russo*.

2. *Elliot* is Distinguishable and Not on Point

      The Defendants also rely on *Elliott v. City of Hartford*, 3:09-cv-948 (AWT).  Specifically the Defendants rely on some dicta in a motion that did not concern the CSA.  Now, in *Elliot*, Judge Thompson *did* grant a motion to dismiss for 11A immunity.  But as can be seen from the complaint, the amended complaint, and the second amended complaint, there was no prospective claim in *Elliot* for injunctive relief.  That Plaintiff only sought money damages which would draw on the state coffers.  Accordingly, the motion to dismiss was granted in a short paragraph on page 5 of entry 31 in that case (Mar. 17, 2011, *available at* 2011 WL 1045451) with very little reasoning.  The facts of *Elliot* are materially different from the present case and the Court should not rely on it for persuasive authority.

3. *Inkel* is Distinguishable and Not on Point

      The Defendants also rely on *Inkel v. Connecticut*, 3:14-cv-1303 (MPS), specifically entry 18 (July 2, 2015), *available at* 2015 WL 4067038.[1]  The issue in the case is not 11A immunity.  The case was dismissed for lack of standing and failure to state a claim.  *See id.* at 5 n.3. The language quoted was in support of the proposition that "Mr. Inkel has not pleaded facts, however, showing that Mr. [Kevin] Kane [the CSA at the time] is directly

---

[1]N.B. The relevant quote from the Defendants' brief appears on page 9 in the PACER opinion, not on page 5 as the Westlaw citation suggests nor on page 13 as the Lexis citation suggests.

4

connected to, or responsible for, the alleged violations." *Id.* at 9.

> "Mr. Kane's name appears once in the Amended Complaint, in a list of
> people to whom Mr. Inkel complained about unlawful police conduct
> between July 1993 and August of 1994 . . . long before Mr. Kane became
> the Chief State's Attorney."

Given the substantive legal differences and that the case did not concern 11A

immunity, the Court should not rely on *Inkel* as persuasive authority.

4. *Powers* is Not on Point and Cites Superseded State Authority

As mentioned before, the State relies also on some language in

*Powers v. Coe*, 728 F.2d 97, 99 n.3 (2d Cir. 1984). The footnote cited relies

on a statute that has been repealed, and the duties of the CSA have

Constitutionally changed since 1984. Although some are the same, some are

not, and the Court should not rely on the dicta as controlling. At any rate,

unlike this case, *Powers* does not concern 11A immunity.

5. *HealthNow New York* is Distinguishable

The Defendants rely on *HealthNow New York, Inc. v. New York*, 739 F.

Supp. 2d 286 (W.D.N.Y. 2010), aff'd, 448 F. App'x 79 (2d Cir. 2011) on page

13 of their memorandum. The suit was against the Attorney General of New

York, who in a number of ways is a fair analogue to the Chief State's

Attorney. But the statute at issue in *HealthNow* was not enforced by the

Attorney General or any prosecutor. It was an Anti-Subrogation law enforced

by *private parties*. *See id.* at 291. The law regulated a specific aspect of

personal injury cases. In contrast, the present case concerns a criminal

statute. The CSA is specifically charged as the chief officer of the division of

criminal justice "which shall be in charge of the investigation and prosecution

of all criminal matters."  Connecticut Constitution, Article XIII.  *HealthNow*  is

factually distinguishable from the present case.

## C.  The CSA has the Power to Enforce Connecticut General Statutes § 53-37

The State agrees that the CSA has the power to sign any warrants or

informations.  *See* Memorandum at 12; *see also* Connecticut General Statutes

§ 51-277.  Authority to effect an arrest is enforcement of a statute, and serves as

enough to silence a speaker.  The State provides no authority contrariwise.

It is important to note that the State *could* end this inquiry very easily, but

has opted not to do so.  The CSA *could* submit an affidavit spelling out that he

lacks the authority to enforce § 53-37 and explaining that it has no desire to have

the statute enforced.  Based on my experience as a defense attorney and my

research as I detail in the affidavit, I do not believe the State will do so because

the CSA wants to keep the power of discretion to enforce the law and wants to

have the law enforced.  I believe the CSA essentially wants to have its cake and

eat it too.  I believe the CSA will play coy when pressed in federal court, but will

not hesitate stateside to exercise its authority the chief officer of the division of

criminal justice to see the law enforced.

## D.  In the Alternative, the Court Should Hold an Evidentiary Hearing on the Scope of the CSA's Authority and Willingness to Enforce the Statute

Based on my experience and research as described in the affidavit, I

believe the CSA has the power and the willingness to have § 53-37 enforced for

the purposes of the *Ex parte Young*  exception to 11A immunity.  In addition, the

CSA will not, I expect, definitely disavow the scope of its power or willingness to

see § 53-37.  In light of the uncertain facts, if the Court is inclined to grant the

6

motion to dismiss on these grounds of 11A immunity, I therefore request an evidentiary hearing so that the factual question of the scope of the authority and willingness to enforce at issue can be properly explored.

### E. If this is a Deficiency, Amending the Complaint would Cure this Deficiency

If the Court is nonetheless persuaded that the CSA is not a proper party, and the Court is unwilling to allow an evidentiary hearing to explore the issue, any deficiency on this issue would be immediately cured by adding the State's Attorney where I reside as a defendant.  I am a resident of Hartford.  If the Chief State's Attorney is not a proper officer because discretion over enforcement is held by the State's Attorney, then the State's Attorney for Hartford would be the proper party.  In the alternative, I respectfully ask that the Court dismiss without prejudice as to refile against that defendant.

## IV. I HAVE STANDING BASED ON HOW THE STATE *ACTS*, NOT WHAT IT *SAYS*

The State claims at 14–25 that I do not have standing.  Specifically, the State claims I fail to satisfy the injury in fact requirement; that I do not allege specific or sufficient facts as to speech that is arguably protected constitutionally or arguably proscribed by statute; that *Sherwood* controls and any speech does not fall within the ambit of the statute; and that I fail to establish a credible threat of prosecution.

I agree that the Complaint is sometimes not especially specific as to some of these issues.  Accordingly, I have supplemented my filing here with a sworn affidavit that clarifies some of the issues presented.

Standing requirements are satisfied because, based on how the state has historically enforced § 53-37, I have a genuine apprehension that certain protected

speech I would engage in exposes me to arbitrary enforcement and prosecution for

offensive speech.

**A. First Amendment Standing Requirements**

"[W]e assess pre-enforcement First Amendment claims . . . under

somewhat relaxed standing and ripeness rules. A plaintiff must allege something

more than an abstract, subjective fear that his rights are chilled in order to

establish a case or controversy. . . . But a real and imminent fear of such chilling

is enough. As the Eleventh Circuit has explained, without the possibility of pre-

enforcement challenges, plaintiffs contesting statutes or regulations on First

Amendment grounds face an unattractive set of options if they are barred from

bringing a facial challenge: refraining from activity they believe the First

Amendment protects, or risk civil or criminal penalties for violating the challenged

law." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)

(citations omitted; internal quotation marks omitted).

**B. The History of Enforcement of § 53-37 and Credible Threat of Prosecution**

The history of how the state has enforced the statute causes me to believe

there is a real and imminent threat that protected speech exposes me to criminal

prosecution.  Because of this exposure, there is protected speech I decline to

engage in, and there is speech I sometimes do engage in notwithstanding fear of

prosecution yet cognizant of that fear and chilled by it.

1. <u>Just 20 years after passage, enforcement targeted non-advertising speech</u>

The earliest example I could find of enforcement of what is now

§ 53-37 was in *State* v. *N.D. Cantwell, et al.*, Court of Common Pleas, New

Haven County (September 8, 1938), *as recorded in* Connecticut Supreme Court Records and Briefs, A-135 part 2 at 271–309 (May 1939) (full record attached as Exhibit B).  The trial court judgment is in the record of what would later become *Cantwell v. Connecticut*, 310 U.S. 296, 60 SCt. 900 (1940).  On page 272 of the record, the judgment file states that the second count of the information was under the then-existing racial ridicule statute.

It's plain that enforcement in *Cantwell* was directed not at an "advertisement" but at unpopular, offensive speech.  Specifically, in *Cantwell* enforcement was targeted at offensive speech critical of certain religions. The Memorandum of Demurrer at 271 (consisting of two leafs) has a summary of facts as to this prosecution:

> By more specific statement the Prosecuting Attorney has by reference made part of the information several books and pamphlets and has also quoted in extenso certain passages therefrom.
>
> It appears that these publications are written and published by persons other than the accused, but have been exhibited or distributed by the accused, and whatever offense, if any. They have committed involves the possession, distribution or exhibition of this printed matter.
>
> It is obvious that the author is strongly prejudiced against what he terms "the Roman Catholic Hierarchy" and that he has little respect for either the Protestant or Jewish faiths. Much that appears in these publications would give offense to devout persons of either of these religious persuasions, if forced upon their attention. Most persons would ignore such emanations as unworthy of serious attention.
>
> I regard them as matters which the author may lawfully write and the accused lawtully possess.
>
> I therefore sustain the demurrers as to the first, second and fourth counts on the general ground that as made more specific they are insufficient in law.

Text on the following leaf characterizes the publications as a "stupid, bigoted or fanatical attack."

The content of a recorded reading of one book is in the record at 285–286.  The contents are fairly to be characterized as a mean attack on Catholicism and the Pope, characterizing him as Satan and the cause of much suffering.  One individual who heard the recording "stated that he thought it was a pretty rotten attack on religion." *Id.* at 274.

This prosecution came about 20 years after adoption of the law in 1917.  Even at this early date, though, prosecutors were not directing enforcement at an advertisement.  The law was used to target unpopular and offensive speech, not a business advertisement.

2.  Enforcement targets non-advertising speech in 1969

*State v. Jensen* is another example of the statute being enforced vis-à-vis non-advertising speech.  The record in *Sherwood*, as cited in the State's Exhibit 1, on page 7 of that opinion, indicates that the state brought a criminal information under § 53-37 to prosecute the distribution of "handbills purported to contain libelous statements."  The handbills were plainly not advertisements according to *Jensen*.

On pages 19–20, the State also relies on *State v. Jensen*, as cited in *Sherwood* and Exhibit 1. The State claims that this Court must respect *Jensen* as the only law on point in Connecticut.

But *Jensen* is not the law of Connecticut.  There is no record of the opinion ever being cited in another Connecticut case.  There is no evidence of

any judgment of any Connecticut court following *Jensen*.  There is no record of *Jensen* except this one fleeting mention.  First Amendment scrutiny requires at the very least that this Court looks past what the State claims is the law de jure to examine how the law is actually enforced de facto.

3.  <u>OLR Reports the Statute Targets Non-Advertising speech</u>

The Office of Legislative Research describes itself as providing "nonpartisan, objective research for all 187 members of the Connecticut General Assembly and their caucus staff."  See About the Office of Legislative Research, https://www.cga.ct.gov/olr/about.asp. It is not a binding authority on Connecticut Courts, but it does provide guidance on statutory interpretation through the lens of those who write the statutes.

There are two OLR reports that comment on § 53-37.  A 2008 OLR Report indicates that "A person commits this crime if he ridicules any person or class of people on account of creed, religion, color, denomination, nationality, or race."[2] There is no mention of an "advertising" requirement.  A 1999 OLR Report indicates that "§ 53-37 addresses speech that ridicules a person. There are no cases interpreting this statute. Its constitutionality is unclear under the U.S. Supreme Court's rulings."

It is clear that the staff at the OLR construe the statute as applying to non-advertising speech.  It is also clear that OLR does not consider *Jensen* to be the law of the State of Connecticut—"there are no cases interpreting this

---

[2] See *Connecticut Hate Crime Laws*, Office of Legislative Research (April 15, 2008) available at https://www.cga.ct.gov/2008/rpt/2008-R-0276.htm

statute."

4.  For the past 20 years, enforcement targets interpersonal communications

      Eugene Volokh, a well-respected UCLA First Amendment law professor, has written about § 53-37 on a few occasions, if in a context less formal than a full-on research paper.[3]  He has examined not only the statute's history, meaning, and constitutionality, but also examined the history of its enforcement.

      In 2018, Professor Volokh published a short essay of about 1350 words on § 53-37. Eugene Volokh, *"Racial Ridicule" Is a Crime in Connecticut—and People Are Being Prosecuted*, The Volokh Conspiracy (August 6, 2018) available at https://reason.com/2018/08/06/racial-ridicule-is-a-crime-in-connecticu/.  He surveys enforcement of the statute from 2000 to 2017.  He notes, as concerns his survey:

> "[I]t turns out that Connecticut prosecutors aren't enforcing the law as it is written. I have found no prosecutions for advertisements that ridicule people based on race or religion -- not for commercial advertisements (which in any event would be pretty bad for business these days) and not for political advertisements.

---

[3] See Eugene Volokh, *Connecticut Commission Opposes Repeal of "Racial Ridicule" Law* (February 22, 2020) available at https://reason.com/2020/02/22/connecticut-commission-opposes-repeal-of-racial-ridicule-law/

    See also Eugene Volokh, *"Racial Ridicule" Is a Crime in Connecticut—and People Are Being Prosecuted*, The Volokh Conspiracy (August 6, 2018) available at https://reason.com/2018/08/06/racial-ridicule-is-a-crime-in-connecticu/

    See also Eugene Volokh, *Connecticut "Racial Ridicule" Statute*, The Volokh Conspiracy (June 7, 2010) available at http://volokh.com/2010/06/07/connecticut-racial-ridicule-statute/

"Rather, based on the 13 police reports that I've read, prosecutors seem to be enforcing the statute to punish people for race- or religion-based "fighting words": generally speaking, face-to-face personal insults that include racial or religious slurs."

I spoke with Professor Volokh several years ago about his research for that essay and he indicated to me that the documents he examined were obtained through the Connecticut Judicial Branch.

In this 2018 short essay, Professor Volokh furthermore cites to a 2014 East Haven Police Department manual.[4]  On page 4, the manual also omits the "advertising" element that the State relies on so heavily in *Jensen* and *Sherwood*.

Over the years, there are other published incidents in the news concerning enforcement of § 53-57.  Although there is no instance where the statute was applied in the context of advertising, it *has* been applied to filing a false police report, insulting someone at a Taco Bell, yelling racial slurs at a school, and a bar fight.[5]  The statute is becoming something of a

---

[4]East Haven Manual available at http://www.easthavenpolice.com/wp-content/uploads/2017/02/423.2_-_Bigotry_and_Bias_Crimes_Effective_09-01-2014.pdf

[5]"Legal Developments, Stamford Connecticut" (November 15 2008) ("Four high school students were arrested for allegedly yelling racial slurs . . . charged with ridicule of race, creed and color") available at https://www.splcenter.org/fighting-hate/hate-incidents?f%5B0%5D=field_state%3A21&page=1

"Arrest Made Regarding a False Complaint Made Against a Trooper" Department of Public Safety (March 6, 2008) ("The video concluded that the information provided by the complainant/accused in this case was intentionally false and misleading"  charges included § 53-37) available at https://www.legistorm.com/stormfeed/view_rss/3055526/organization/126738/title/arrest-made-regarding-a-false-complaint-made-against-a-trooper.html

prosecutorial Swiss Army knife in this way.  This trend of enforcement

targeting interpersonal, non-advertising speech has continued in the past few

years as well.[6]

Finally, I direct attention to Exhibit C. These are excerpts from two

police reports in Geographical area 12 (a subdivision of the Hartford Judicial

District) over the past year where an individual was arrested pursuant to § 53-

37.  Geographical area 12 is a location where I am likely to engage in speech

that could expose me to prosecution because I frequent a comedy club there,

and speech in that area can be very offensive.  Neither of these arrests in

Exhibit C concern advertisements of any kind.  Both involve offensive

---

"Town News Briefing," Hartford Courant (February 3, 2006)(" A woman accused of using racial epithets while waiting for food at a Taco Bell drive-through window was arrested Wednesday. . . . charged with ridicule on account of race, creed or color and second-degree breach of peace.") available at https://www.courant.com/news/connecticut/hc-xpm-2006-02-03-0602030711-story.html

"Police News," Hartford Courant (November 4, 1999)(" Four men were arrested Tuesday in connection with three fights at a local bar . . . [one individual] was charged with ridicule on a account of race and breach of peace stemming from fights") available at https://www.courant.com/news/connecticut/hc-xpm-1999-11-04-9911040265-story.html

[6]"Connecticut student arrested in connection to racist Snapchat post" CNN (May 22, 2021) *available at* https://www.cnn.com/2021/05/21/us/connecticut-racist-snapchat-post/index.html

See, e.g., Adam Steinbaugh, "University of Connecticut police arrest students for use of racial slur" FIRE.org (October 22, 2019) available at https://www.thefire.org/university-of-connecticut-police-arrest-students-for-use-of-racial-slur/

"Newtown Police Make Arrest After Alleged Racist Remarks Made During Virtual Class" (May 29, 2021) https://www.msn.com/en-us/news/crime/newtown-police-make-arrest-after-alleged-racist-remarks-made-during-virtual-class/ar-AAKwnGX

language.

5. No records of § 53-37 being enforced as to an actual advertisement

After researching the issue thoroughly, I am unable to find a single instance where § 53-37 was actually applied to advertising. Regardless of what the State *says* the statute means when pressed in federal court, my speech is chilled by the street-level enforcement that the State actually *does*.

**C. Particular Speech at That is Chilled, or the Injury-in-Fact**

The prosecution claims I do not identify with particularity the speech that is chilled. The following particulars are also spelled out in the attached affidavit. Out of fear of prosecution under the statute, I avoid any use of racial epithets in any context whatsoever. Out of fear of prosecution under the statute, I do not tease individuals for their non-American accents when we are around strangers or police. On social media, I do not post content that someone might find very offensive on race or nationality or religion, even in an academic sense, not because of social media platform rules, but because police have enforced the § 53-37 against speech on social media.[7]

I a recent example is handy. When Gilbert Gottfried died, I did not repeat one of my favorite jokes by him on social media. Some of his jokes are horrible, racist jokes that nonetheless make me laugh, no matter how hard I try not to

---

[7] See, e.g., "Connecticut student arrested in connection to racist Snapchat post" CNN (May 22, 2021) *available at* https://www.cnn.com/2021/05/21/us/connecticut-racist-snapchat-post/index.html.

laugh.[8]   I declined to post content like this not because of any rules on the Social

Media platforms.  I decline because the statute has been applied to speech on

social media.  I decline because offending someone and dealing with a criminal

prosecution is more hassle than sharing an idea I have at that moment time is

worth.

     The speech at issue is crass speech that tends to make fun of someone

on the basis of race, nationality, or religious beliefs. It could be tearing someone

apart for an accent, it could be something I heard by a comedian at the Hartford

FunnyBone.  This kind of speech of course can include the use of racial epithets.

Other speech at issue express extreme derision at religious groups whose beliefs

I find to be harmful to society.  The speech at issue also includes racial slurs

used in a more innocent context, but where I have a fear that taken out of that

context or misconstrued, the speech could cause extreme offense.  This includes

academic discussions of cases like *State v. Liebenguth*  and *Tam v. Matal*, both

of which involved racial slurs. The speech could be interpersonal speech or on

social media.

### D. The Chilled Speech is Protected

     Outside of fighting words, racial epithets, speech insulting religious views,

or misogynistic speech are all protected, as is all speech demeaning as to race,

nationality, ethnicity, or religion.  *See Matal v. Tam*, 137 S. Ct. 1744, 1764

(2017)("Speech that demeans on the basis of race, ethnicity, gender, religion,

age, disability, or any other similar ground is hateful; but the proudest boast of

---

[8]See, e.g., Gilbert Gottfried's Twitter @RealGilbert (February 16, 2018 10:35 a.m.)
available at https://twitter.com/realgilbert/status/964523763655114752?lang=en

our free speech jurisprudence is that we protect the freedom to express the
thought that we hate." [internal quotation marks omitted]); see also *Reed v. Town
of Gilbert*, 576 U.S. 155, 169, 135 S. Ct. 2218 (2015)(speech regulation targeted
at specific subject matter is impermissibly content based).

## V. CONCLUSION

For the foregoing reasons, the Motion should be denied.  In the alternative, I
request leave to amend my complaint to cure any defects the Court may find.  In the
second alternative, I request the Court dismiss the case without prejudice to refile to
cure any defects the Court should find.

MAY 2, 2022                          Respectfully submitted,

                                     THE PLAINTIFF, pro se

                                     */s/ Mario Cerame ct30125*
                                     Mario Cerame, pro se

                                     Brignole, Bush & Lewis LLC
                                     73 Wadsworth Street
                                     Hartford, Connecticut 06106
                                     T: 860.527.9973
                                     F: 860.527.5929
                                     E: mario@brignole.com

## CERTIFICATION

I hereby certify that a copy of the foregoing has been or shall immediately be filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Mario Cerame ct30125*
Mario Cerame, pro se